Slip Op. 13- 111

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **DUPONT TEIJIN FILMS, MITSUBISHI POLYESTER FILM, INC., SKC, INC., and TORAY PLASTICS (AMERICA), INC.,** | |
| Plaintiffs, | |
| v. | Before: Jane A. Restani, Judge |
| **UNITED STATES,** | Court No. 12-00088 |
| Defendant, | |
| and | |
| **TIANJIN WANHUA CO., LTD., FUWEI FILMS (SHANDONG) CO., LTD.,  and SICHUAN DONGFANG INSULATING MATERIAL CO., LTD.,** | |
| Intervenor Defendants. | |

[Final Results of Redetermination in antidumping duty review remanded.]

## OPINION AND ORDER

Dated: August 21, 2013

David M. Horn, Jeffrey I. Kessler, Patrick J. McLain, and Ronald I. Meltzer, Wilmer, Cutler, Pickering, Hale & Dorr, LLP, of Washington, DC, for the Plaintiffs.

David F. D'Alessandris, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Whitney M. Rolig, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

David J. Craven, David A. Riggle, and Saichang Xu, Riggle and Craven, of Chicago, IL,

for the Intervenor Defendants.

      Restani, Judge:  This matter is before the court following a remand to the

Department of Commerce ("Commerce") in Dupont Teijin Films v. United States, 896 F. Supp.

2d 1302 (CIT 2013).  This action involves a challenge to Commerce's final results in the second

antidumping duty review of polyethylene terephthalate film, sheet, and strip ("PET film") from

the People's Republic of China ("PRC").  See Polyethylene Terephthalate Film, Sheet, and Strip

from the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty

Administrative Review of the Antidumping Duty Order, 77 Fed. Reg. 14,493 (Dep't Commerce

Mar. 12, 2012) ("Final Results").  The court determines that, for the reasons below, Commerce

failed to provide a reasoned justification for disregarding the gross national income data reported

in the World Development Report of 2011 (the "2009 GNI data"), and thus, its selection of India

as the surrogate market economy country for the PRC is not in accordance with law and not

supported by substantial evidence.

## BACKGROUND

      The court assumes familiarity with the facts of this case as set out in the previous

opinion, although they are summarized below.  See Dupont Teijin Films, 896 F. Supp. 2d at

1304–06.

      In December 2010, Commerce published its notice of initiation of the second

administrative review of the antidumping duty order of PET film from the PRC for the period of

review ("POR") of November 1, 2009 through October 31, 2010.  See Polyethylene

Terephthalate Film, Sheet, and Strip From the People's Republic of China: Preliminary Results

of the 2009-2010 Antidumping Duty Administrative Review, 76 Fed. Reg. 68,140, 68,141 (Dep't

Commerce Nov. 3, 2011) ("Preliminary Results").  On April 8, 2011, Commerce stated that it

considered the PRC to be a non-market economy ("NME") and placed on the record a list of

countries its Office of Policy ("OP") had found to be economically comparable to the PRC.

April 8 Memorandum, Pls.' App. in Supp. of Pls.' Cmts. on the First Remand Determination

("Pls.' App."), Tab 8 at 1, 5.  Commerce stated in the April 8 Memorandum that "comments, if

any, on surrogate country selection must be submitted to the Department no later than April 22,

2011.  Rebuttal comments, limited to information submitted by parties on surrogate country

selection, are due no later than April 29, 2011."  Id. at 2.  Plaintiffs-Petitioners Dupont Teijin

Films, Mitsubishi Polyester Film, Inc., SKC, Inc., and Toray Plastics (America), Inc. (collectively

"Plaintiffs") and other interested parties filed factual information and comments related to

Commerce's list on April 22, 2011.  See Final Results of Redetermination Pursuant to Court

Order at 2, n.3 (Dep't Commerce May 8, 2013) (Docket No. 41) ("Remand Results").  Plaintiffs

argued that based on 2008 GNI data, India was no longer at a level of economic development

comparable to the PRC.  Id. at 2–3.  Plaintiffs, however, did not then make arguments based on

the 2009 GNI data, nor did they place the 2009 GNI data on the record, even though the World

Bank had released the data on April 11, 2011, within the comment period set by Commerce.  See

id. at 3, 7.  On October 3, 2011, Plaintiffs filed pre-preliminary results comments and the 2009

GNI data, and they argued that India and the PRC were not economically comparable based on

the 2009 GNI data.  Pet'rs' Pre-Preliminary Cmts. (Oct. 3, 2011), Pls.' App. Tab 1 at 2–3.

In the Preliminary Results, Commerce selected India as the surrogate country.  76

Fed. Reg. at 68,142.  Commerce concluded that "both Thailand and India are at a level of

economic development comparable to that of the NME country and are significant producers of

comparable merchandise."  Id.  Commerce selected India, however, because it found the record

contained surrogate data from India that was superior compared to the record data from

Thailand.[1]  Id.  In the Final Results, Commerce again selected India as the surrogate country.  See

77 Fed. Reg. at 14,494.  In the Final Results, Commerce relied on the OP's determination of

economic comparability, which was based on the 2008 GNI data, to justify its selection of India.

Issues and Decision Memorandum for the Final Results of the 2009-2010 Administrative

Review, A-570-924, ARP:11/1/2009-10/31/2010, at 3 (Mar. 2, 2012) ("Issues and Decision

Memorandum"), available at http://ia.ita.doc.gov/frn/summary/PRC/2012-5936-1.pdf (last

visited Aug. 20, 2013).  Commerce argued the 2009 GNI data did not affect its determination

because the change in disparity between India's and the PRC's GNI between 2008 and 2009 was

not significant enough to render India not economically comparable to the PRC.  Id. at 3–4.

      In Dupont Teijin Films, the court rejected Commerce's justification for ignoring

the 2009 GNI data because Commerce failed to explain or justify why the disparity between the

---

[1]  In the Preliminary Results, Commerce found that the single financial statement on the record from a Thai company did not apportion raw material costs and consumable costs and thus, could not be used to calculate surrogate financial ratios.  76 Fed. Reg. at 68,142.  No party has challenged that finding before the court.  See Dupont Teijin Films, 896 F. Supp. 2d at 1305 n.1.  Accordingly, this litigation may be for naught given the limited surrogate data on the record.  Even if India is not an appropriate single surrogate country, Commerce will have to find a reasonable way to value the factors of production ("FOPs"), and it may end up using some values from India, even if India is no longer a comparable country under Commerce's standard.  See 19 U.S.C. § 1677b(c)(4) (requiring Commerce to value FOPs from economically comparable countries "to the extent possible").

2008 and 2009 GNI data was insignificant.  896 F. Supp. 2d at 1308–09.  Because Commerce did

not provide a reasoned explanation for disregarding the 2009 GNI data and because the 2009

GNI data indicated that India and the PRC were not economically comparable during the POR,

the court concluded that Commerce's selection of India as the surrogate country was not

supported by substantial evidence.  Id. at 1309.  The court remanded for Commerce "to either

provide a reasoned explanation as to why it may disregard the 2009 GNI data or, in the

alternative, make a surrogate country selection with the benefit of the 2009 data."  Id. at

1309–10.

          On remand, Commerce no longer relies on its previous position that the change in

disparity between 2008 and 2009 GNI data was too insignificant to warrant consideration.

Remand Results at 9 ("[T]he Department is no longer relying on the conclusion that the change

in disparity between India's and the PRC's GNI was insignificant.").  Instead, Commerce now

states an entirely new position that although the 2009 GNI data were placed on the record within

the time permitted for submission of factual information, they were submitted too late in the

proceedings to be considered by the OP when making its list of economically comparable

countries.  Remand Results at 4 ("[T]he Department has determined that the 2009 GNI data was

placed on the record too late during the administrative review to be considered . . . ."); id. at 14

(stating that the 2009 GNI data were not an "untimely rejected" submission and "remain[ed] part

of the record . . . [but] appeared too late in the review to have a substantive effect on our list"

(emphasis added)).  Plaintiffs continue to challenge Commerce's selection of India as the

surrogate market economy country and argue that Commerce failed to provide a reasoned

Court No. 12-00088                                                        Page 6

justification for disregarding the 2009 GNI data.  See Pls.' Cmts. on the First Remand

Determination at 5–10 ("Pls.' Cmts.").[2]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not

uphold Commerce's final determination in an antidumping review if it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

Plaintiffs argue that by finding the 2009 GNI data timely filed, but filed too late to

be considered, Commerce has created a new, unannounced deadline that violates the notice and

comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b), (c) ("APA").

Pls.' Cmts. 8–10.  Plaintiffs also argue that even if Commerce's new deadline is valid, it should

not apply in this case because Commerce had ample time to consider the 2009 GNI data and

could have extended the deadline for the Preliminary Results if more time was needed.  Id. at

5–8.  The Defendant argues that the fair and efficient operation of the statute requires that

Commerce "establish the list of economically comparable countries early in a proceeding,

and . . . Commerce is unable to consider new evidence relating to that determination late in the

_____

[2] Intervenor Defendants Tianjin Wanhua Co., Ltd., Fuwei Films (Shandong) Co., Ltd. and Sichuan Dongfang Insulating Material Co., Ltd. do not challenge Commerce's determination on remand.  Cmts. of Def.-Intervenors on Remand Results at 1.  They note, however, that if the court remands this action, Commerce should consider their substantive arguments contained in their previous submissions to Commerce as to why India, and not Thailand, should be chosen as the surrogate country.  Id. at 2.

proceeding."  Def.'s Resp. to Pls.' Cmts. Regarding the Remand Redetermination ("Def.'s

Resp.") at 6–12.  The Defendant argues this is not a new rule, but is merely a clarification of a

2004 policy memorandum that stated that Commerce will request a list of economically

comparable countries from the OP "early in a proceeding."  Id. at 12–14.

       When valuing the factors of production ("FOPs") in NME reviews, Commerce

must, to the extent possible, use surrogate data from a country that is at a level of economic

development comparable to the NME and is a significant producer of comparable merchandise.

19 U.S.C. § 1677b(c)(4); Dorbest Ltd. v. United States, 604 F.3d 1363, 1370–72 (Fed. Cir. 2010)

(noting that the statute is clear that Commerce must use data from economically comparable

countries unless such data are not available or are irretrievably tainted).  In practice, Commerce

usually values the FOPs from a single market economy country, known as the surrogate country.[3]

See 19 C.F.R. § 351.408(c)(2) (2011).  Commerce determines the surrogate country through a

four-step process, starting with a determination of which countries are at a level of economic

development comparable to the NME.  See Policy Bulletin 04.1, Non-Market Economy

Surrogate Country Selection Process (April 8, 2011) ("Policy Bulletin 04.1"), Pls.' App. Tab 8,

Attach. 2 at 2–4 (outlining Commerce's four-step process in selecting the surrogate country).[4]

---

   [3] Although it is Commerce's preferred practice to value the FOPs from a single surrogate
country, see 19 C.F.R. § 351.408(c)(2), this is not required by statute, see 19 U.S.C.
§ 1677b(c)(1), (4) (directing Commerce to value the FOPs with "prices or costs of factors of
production in one or more market economy countries" that are economically comparable and
significant producers of comparable merchandise).

   [4] In the typical case, Commerce's four-step process is as follows.  First, Commerce's OP
creates a list of countries found to be economically comparable to the NME.  Policy Bulletin 04.1

(continued...)

"First, early in a proceeding, the operations team sends the Office of Policy ("OP") a written

request for a list of potential surrogate countries.  In response, the OP provides a list of potential

surrogate countries that are at a comparable level of economic development to the NME

country."  Id. at 2.

The OP generally selects five to six countries for inclusion on its list based on

GNI data reported in the most recent World Development Report, but it also considers which

countries are likely to offer adequate surrogate value data.  Id. at 2–3.  The OP relies on the most

current annual issue of the World Development Report that is available at the time the OP makes

its list.  Id. at 2; see also Issues and Decision Memorandum for the 2004 - 2005 Administrative

Review of Wooden Bedroom Furniture from the People's Republic of China, A-570-890, ARP:

06/24/2004-12/31/2005, at 28 (Aug. 8, 2007) ("WBF Issue and Decision Memorandum"),

available at http://ia.ita.doc.gov/frn/summary/PRC/E7-16584-1.pdf (last visited Aug. 20, 2013)

(declining to consider GNI data placed on the record after the preliminary results because the

data were not available at the time the OP created its list).[5]  Once Commerce releases the OP list,

---

[4](...continued)
at 2.  Second, Commerce eliminates countries on the list that are not producers of comparable
merchandise.  Id. at 2–3.  Third, Commerce determines which of the remaining countries are
significant producers of comparable merchandise.  Id. at 3–4.  Fourth, if more than one country
from the list remains viable, Commerce determines which country offers superior data from
which to value the FOPs.  Id. at 4.  Although the OP's list is not intended to be exhaustive and
parties may request that Commerce select a country not on the list, it is Commerce's practice to
select from the OP list unless all of the listed countries lack sufficient data or are otherwise
unsuitable.  See id.

[5]  In the first antidumping review for Wooden Bedroom Furniture, the respondents in that
case challenged Commerce's decision to ignore the updated World Bank data placed on the
(continued...)

Commerce will not change its original determination of economic comparability, and Commerce

will not revise the list, even if a new World Development Report is issued during the

proceedings.  Remand Results at 6; WBF Issue and Decision Memorandum at 28 ("The

Department cannot wait for a new World Development Report to be released before issuing the

list of potential surrogate countries nor can it change the list if a new World Development Report

is released during a proceeding.").

      In the Remand Results, Commerce explains that revising the OP's list in light of

newly submitted GNI data is not feasible because it would require additional time for Commerce

to evaluate all the countries listed in the World Development Report, not just those on the OP's

original list.  Remand Results at 6.  According to Commerce, revising the OP list would nullify,

in whole or in part, the parties' comments, rebuttals, and submissions of surrogate value data,

causing delays and wasting resources of both Commerce and the parties.  Id.  Commerce also

argues that continually revising the list would result in a decrease in the quality of surrogate

value data, because parties would focus on submitting information for a variety of potential

surrogate countries, in case their preferred country were eliminated from the list, instead of

focusing on gathering reliable data from a single potential surrogate country.  Id. at n.16.

      On the record here, Commerce concluded in the same vein that it could disregard

---

[5](...continued)
record during the proceedings.  See Fujian Lianfu Forestry Co., Ltd. v. United States, 638 F.
Supp. 2d 1325, 1347 (CIT 2009).  The court, however, did not review Commerce's justification
for rejecting the GNI data, which is similar to the justification presented here, because it found
that the respondents had failed to present a developed argument and thus, had waived the issue.
Id. at 1349–50.  Thus, Fujian is not helpful here.

the 2009 GNI data, even though it also found that the data were timely submitted pursuant to

regulation, because the data had not been released and were not on the record at the time the OP

issued its list.  Remand Results at 5 ("[T]he list of potential surrogate countries must be

established early in the administrative process . . . .") (emphasis added); id. at 14 ("We

acknowledge that the data remain part of the record; however, our position is that the data

appeared too late in the review to have a substantive effect on our list of economically

comparable countries . . .") (emphasis added).  But, Commerce actually goes further than simply

saying that it need not consider factual information submitted after the period for comment on

surrogacy.  This case is similar to Fresh Garlic from the People's Republic of China: Final

Results of the 2009-2010 Administrative Review of the Antidumping Duty Order, 77 Fed. Reg.

34,346 (Dep't Commerce June 11, 2012), where Commerce noted the necessity of basing its

economic comparability finding on the information available to the OP at the time it issues its

list.  See Issues and Decision Memorandum for Fresh Garlic from the People's Republic of

China: Final Results of the 2009-2010 Administrative Review, A-570-831,

POR:11/01/09-10/31/10, at 2–6 (June 4, 2012) ("Fresh Garlic"), available at

http://ia.ita.doc.gov/frn/summary/PRC/2012-14152-1.pdf (last visited Aug. 20, 2013).

Commerce also noted that the comments were untimely, see id. at 4, the reason it now offers

here.  But Commerce continues to suggest that as long as the OP relies on the most current

World Development Report available at the time the OP makes its list, administrative constraints

permit Commerce to disregard any subsequently filed record evidence on this issue, and its

determination of economic comparability in the Final Results will be supported by substantial

evidence.  This is the same position Commerce took in the <u>WBF Issue and Decision</u>

<u>Memorandum</u> cited <u>supra</u> and on which it relies here to demonstrate its consistent practice.  <u>See</u>

Def.'s Resp. at 13–14 (stating that although this is the first time Commerce has articulated its

reasoning at length, it has taken the same position in previous cases, including the antidumping

reviews of Wood Bedroom Furniture and Fresh Garlic).  Thus, Commerce's comment period on

"surrogate country selection" is essentially a nullity as to issues of economic comparability.

   Given Commerce's apparent position that the OP's finding is determinative as to

the issue of economic comparability if based on data in existence at the time it issues its list, and

that the list will not be revised if new data arises after the list is placed on the record because,

<u>inter alia</u>, comments on surrogacy depend on a static list, it follows that Plaintiffs' delay in

submitting the 2009 GNI data in October is irrelevant, and Commerce's belated attempt to rely

on such delay is suspect.  Commerce determines on which <u>World Development Report</u> to rely

based on when the World Bank releases the report relative to when the OP creates its list.

Commerce's past statements and the record here indicate Commerce would have ignored the

subsequently released 2009 GNI data, regardless of whether it was submitted in April or in

October.  Moreover, Commerce implicitly found the data timely under its regulations when it

expressly rejected the suggestion that it treat the 2009 GNI data as an "untimely rejected

submission" under 19 C.F.R. § 351.302(d).  <u>Remand Results</u> at 10 & n.26–27, 14 (rejecting

argument from respondents that Commerce had the authority to reject the 2009 GNI data as an

untimely factual submission and to not consider the information under 19 C.F.R. § 351.302(d)).[6]

Because Commerce declined to treat the 2009 GNI data as "untimely," Commerce's and

Defendant's attempts to characterize the 2009 GNI data as "late" is inapposite.[7]  The

---

[6]  When a party submits factual information that does not meet its regulatory deadlines, Commerce will not retain that information on the record.  See 19 C.F.R. § 351.302(d)(1). Commerce did not indicate at the time the 2009 GNI data were submitted that they were untimely factual information and instead addressed the merits of the data in the Final Results.  See Issues and Decision Memorandum at 3–4; cf. Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("Commerce generally does not consider untimely filed factual information."). Although Commerce might have rejected the 2009 GNI data as an untimely submission, the record is clear that Commerce did not consider the 2009 GNI data to be an untimely factual submission.  Thus, the court cannot rely on Commerce's ability to reject untimely factual information as a justification for its actions here.  See Changzhou Wujin Fine Chem. Factory Co. v. United States, 701 F.3d 1367, 1379 (Fed. Cir. 2012) ("Review of an administrative decision must be made on the grounds relied on by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." (internal quotation marks and brackets deleted)).

[7]  Despite expressly rejecting the suggestion that the 2009 GNI data were an untimely submission, both Commerce and the Defendant reference various deadlines to imply that Plaintiffs failed to timely submit the 2009 GNI data.  Remand Results at 7–8, 14 (noting the 2009 GNI data was not filed within a five week comment period, ending May 13, 2011); Def.'s Resp. at 9 (noting Plaintiffs failed to submit the data prior to May 13, 2011).  The May 13, 2011 deadline, however, is not a regulatory deadline, nor is it a final deadline.  The April 8 Memorandum stated that if the parties wanted Commerce to consider information submitted to "value factors of production from the surrogate country" for purposes of the preliminary results, the parties must submit that information by May 6, with rebuttal comments due May 13, 2011. Assuming GNI data should be treated the same as information "to value factors of production from the surrogate country," which is debatable given that GNI data is not directly used to value FOPs, such data can be submitted up to 20 days after the preliminary results, pursuant to regulation.  See 19 C.F.R. § 351.301(c)(3)(ii).  If this regulation is applicable to GNI data, then the 2009 GNI data were timely submitted here (it was submitted one month prior to the preliminary results), and the May 13, 2011 deadline does not render the 2009 GNI data untimely or late.

Commerce also notes the 2009 GNI data were filed one month prior to the preliminary results and six months after the issuance of the OP list, neither of which line up with existing

(continued...)

determinative issue here is not the timing of Plaintiffs' submission, but whether Commerce's

blanket rule of ignoring factual information issued after the OP issues its list or its failure to

clearly set forth a time for objecting to economic comparability findings effectively eliminates

any meaningful comment period on the issue of economic comparability.  For the following

reasons, the court finds that this is not consistent with the statute or implementing regulations.

         In general, Commerce has the discretion to create its own rules of procedure

related to the development of the record in order to meet its statutory deadlines.  PSC VSMPO -

Avisma Corp. v. United States, 688 F.3d 751, 760–61 (Fed. Cir. 2012) (noting Commerce's

discretion in developing the record); see also Coal. for the Preservation of Am. Brake Drum &

Rotor Aftermarket Mfrs. v. United States, 23 CIT 88, 94, 44 F. Supp. 2d 229, 237 (1999) (noting

well-settled principles of administrative law permit an agency to establish and enforce time limits

concerning the submission of written information and data).  Commerce's exercise of its

discretion, however, must be reasonable in light of Commerce's statutory obligations.  See

Sterling Fed. Sys., Inc. v. Goldin, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (noting the agency abuses

its discretion when its decision is "clearly unreasonable, arbitrary, or fanciful").  For example,

although Commerce has the discretion to regulate administrative filings, "that discretion is

---

[7](...continued)
regulatory deadlines.  Remand Results at 8.  Commerce, however, makes no reference to the
regulatory deadline for the submission of factual information.  See 19 C.F.R. § 351.301(b)(2)
(stating that unless otherwise specified in the regulations, factual information for the final results
of an administrative review is due 140 days after the last day of the anniversary month).
Commerce's disregard of some deadlines and its reliance on other, seemingly inapplicable
deadlines, leaves the court and the parties with no clear explanation as to when "late in a
proceeding" occurs and when GNI data must be submitted in order to be considered.

bounded at the outer limits by the obligation to carry out its statutory duty of determining

dumping margins as accurately as possible." Wuhu Fenglian Co. v. United States, 836 F. Supp.

2d 1398, 1403 (CIT 2012) (quotation marks and brackets deleted); see also Grobest & I-Mei

Indus. (Viet.) Co. v. United States, 815 F. Supp. 2d 1342, 1365 (CIT 2012) (stating that in

evaluating Commerce's discretion to set deadlines, administrative concerns must be balanced

against Commerce's statutory obligations of accuracy and fairness).  Additionally, in NME

reviews, Commerce's discretion is bounded by its statutory obligation to value the FOPs with

surrogate data from an economically comparable country, unless such data were not available.

See Dorbest, 604 F.3d at 1371–72.

        Here, Commerce abused its discretion by depriving the parties of a meaningful

opportunity to comment on the OP's initial finding of economic comparability.  Although

Commerce may set reasonable deadlines, it cannot entirely deprive interested parties of the

opportunity to submit factual information on a particular issue.  Cf. Essar Steel, 678 F.3d at 1278

(finding Commerce acted reasonably in rejecting factual information in part because the party

previously "had an opportunity to present its evidence . . . to Commerce during the review); see

also Crawfish Processors Alliance v. United States, 28 CIT 646, 666, 343 F. Supp. 2d 1242, 1261

(2004) (noting Commerce would abuse its discretion if it prevented parties from commenting on

factual information placed on the record by Commerce), rev'd and vacated on other grounds by

477 F.3d 1375 (Fed. Cir. 2007) and 31 CIT 1710 (2007).  Otherwise, Commerce would be free to

place erroneous factual information on the record with no recourse for the parties to respond.

Instead, Commerce must provide the parties a meaningful opportunity to develop an accurate

factual record as to which countries are economically comparable to the NME and will lead to

accurate dumping margins.  See QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir.

2011) ("Although Commerce has authority to place documents in the administrative record . . .

the burden of creating an adequate record lies with interested parties and not with Commerce."

(quotation marks and brackets deleted)).  Commerce's elimination of a meaningful comment

period on economic comparability, therefore, is an abuse of discretion because it results, despite

clear direction in the remand order, in a decision by Commerce to select a surrogate country

without consideration of probative, timely submitted, and apparently unrebutted evidence that the

selected surrogate was in fact not economically comparable to the PRC.  See Wuhu Fenglian,

836 F. Supp. 2d at 1403 (noting Commerce abuses its discretion when it refuses to permit a party

to rebut factual information placed on the record by Commerce to the extent that such a refusal

unduly hampers its ability to accurately determine dumping margins).

        Additionally, Commerce's reliance on the administrative burdens of reconsidering

the OP's list do not excuse it from complying with its statutory obligations to determine accurate

dumping margins, including its statutory obligation to use data from an economically comparable

country.[8]  When the OP issues its list "early in a proceeding," months before the preliminary

_____

        [8]  Commerce argues that it is not unusual for Commerce to disregard record evidence due
to administrative constraints.  Remand Results at 14.  Commerce notes that when selecting
mandatory respondents, Commerce relies on Customs and Border Protection ("CBP") data and
generally does not revise its selection even when subsequently submitted sales data conflict with
the CBP data.  Id. at 15.  When Commerce releases the CBP data, however, Commerce provides
the parties with the opportunity to submit factual information to dispute the CBP data, and
Commerce will consider the parties' submissions when deciding whether to rely on the CBP data
                                                                                (continued...)

results, issues of finality are not yet present, and it is not an undue burden to require Commerce

to set forth clear time limits for comments on comparability and to consider submitted factual

information.  See NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995)

(noting the agency's concern over available resources and its interest in finality but noting that at

the preliminary results stage, the "tension between finality and correctness simply [does] not

exist").  Thus, Commerce's interest in the finality of the OP's list and the administrative burden

of considering subsequently released GNI data does not outweigh Commerce's statutory

obligations here and does not permit Commerce to completely eliminate any meaningful

opportunity to submit factual information related to economic comparability.  See Grobest, 815

F. Supp. 2d at 1365 (finding Commerce abuses its discretion by rejecting even untimely factual

information if the administrative burdens and interest in finality are outweighed by the statutory

obligations of fairness and accuracy).

        Commerce's position in this case also conflicts with its established practice of

permitting parties to submit factual information to "rebut, clarify, or correct" information placed

on the record by Commerce.  See Definition of Factual Information and Time Limits for

---

[8](...continued)
when making its final selection.  See Issues and Decision Memorandum at 19–20 (noting that
Commerce provided the parties with seven days to comment on the CBP data and stating that it
would rely on the CBP data unless timely submissions demonstrate that the data are inaccurate or
otherwise unusable).  Here, Commerce did not provide a meaningful opportunity for the parties
to submit factual information demonstrating that the GNI data relied on by the OP was
inaccurate, and Commerce did not consider any submitted GNI data when deciding whether to
rely on the OP's findings.  Thus, Commerce's rejection of the 2009 GNI data is not analogous to
Commerce's treatment of CBP and sales data.  To the extent it is, the CBP procedure is suspect.

Submission of Factual Information, 78 Fed. Reg. 21,246, 21,250 (Dep't Commerce April 10,

2013) (noting that the final rule merely codified Commerce's existing practice, which was to

"place factual information on the record of a segment and . . . provide[] interested parties with

the opportunity to submit factual information to rebut, clarify, or correct that information.").[9]

Commerce has not provided a reasoned justification for singling out the OP list as factual

information placed on the record by Commerce that the parties cannot rebut, clarify, or correct.

The administrative convenience of a bright-line rule to disregard all GNI data released after the

OP issues its list is not a reasoned justification because, as stated above, time constraints do not

automatically trump Commerce's statutory obligation to determine accurate dumping margins

with surrogate data from an economically comparable country.  See Yangzhou Bestpak Gifts &

Crafts Co. v. United States, 716 F.3d 1370, 1380 (Fed. Cir. 2013) (finding that there is no

support in the statute or court precedent for the suggestion that administrative time constraints

can override the statutory obligations of fairness and accuracy).  Thus, Commerce's preference

for determining economic comparability "early in a proceeding" does not permit it to deny the

parties a clearly defined and meaningful opportunity to submit comments and develop an

accurate factual record on that issue.  See id. (finding that Commerce's preference to review only

two mandatory respondents, and the lack of record evidence that results from that preference,

does not excuse Commerce from its obligation to determine reasonably accurate margins).

---

[9]  Commerce recently codified this practice into a regulation, but the regulation was not in effect at the time of this proceeding.  See Definition of Factual Information and Time Limits for Submission of Factual Information, 78 Fed. Reg. at 21,246 (noting the final rule will apply to all segments initiated on or after May 10, 2013).

If administrative constraints prevent Commerce from considering economic comparability after a certain point in the administrative process, that is, prior to the existing regulatory deadline for the submission of factual information, Commerce may create a reasonable deadline for the submission of GNI data pursuant to the requirements of the APA.  See Paralyzed Veterans of America v. West, 138 F.3d 1434, 1436 (Fed. Cir. 1998) (stating that the APA's notice and comment requirements apply to rules that "effect a change in existing law or policy or which affect individual rights and obligations."); Parkdale Int'l, Ltd. v. United States, 31 CIT 1229, 1246, 508 F. Supp. 2d 1338, 1356 (2007) ("[I]f a rule adopts a new position inconsistent with an existing regulation . . . notice and comment are required." (citations and internal quotation mark deleted)).  Commerce argues that it can impose a deadline for the submission of GNI data without notice and comment because such a deadline would be a clarification of Commerce's existing practice to request the OP's list "early in a proceeding."  Remand Results at 16 (citing Policy Bulletin 04.1).  As indicated, in this case it set no such reasonable deadlines. Further, the Policy Bulletin 04.1 cannot support an unnoticed deadline if it outlines only Commerce's internal procedures for requesting the OP's list and does not address what limitations, if any, apply to the parties.  See Parkdale Int'l, 31 CIT at 1246, 508 F. Supp. 2d at 1356 (noting that in contrast to a substantive rule, which creates a new right or duty, an interpretive rule provides a more detailed clarification of an existing authority).  Commerce cannot create and enforce a deadline specifically for the submission of GNI data that differs from its existing deadlines for the submission of factual information without first complying with the requirements of the APA.  Whether or how it complies, however, is not at issue here.

        In sum, Commerce has failed to provide a reasoned justification for disregarding

the 2009 GNI data.  Commerce accepted the data as timely filed and part of the record, and the

consequence of that decision is that it must justify its selection of the surrogates based on the

substantial evidence on the record, including the 2009 GNI data.  The court previously found that

Commerce's selection of India as the single surrogate country was not supported by substantial

evidence because the 2009 GNI data were not considered, see Dupont Teijin Films, 896 F. Supp.

2d at 1308–09, and Commerce does not really challenge that conclusion.  Commerce's

challenges are procedural, and they fail.

### CONCLUSION

        This matter is remanded for Commerce to reconsider its surrogate country or

countries selection with the benefit of the 2009 GNI data.  The court expresses no opinion on

which country or countries Commerce should select on remand or how it should choose its FOP

data.  If Commerce requires additional information, it may, in its discretion, reopen the record.  It

is time for Commerce to complete this matter and to do what it needs to do to value FOPs based

Court No. 12-00088                                                      Page 20

on the record before it.  Commerce recognizes that India and the PRC are changing with regard

to economic comparability, but it also must recognize that it must give parties an opportunity to

challenge "facts" it sets forth and it must provide notice of deadlines it wishes to enforce.

Commerce has many tools to do its job reasonably, and it must utilize them.

        Commerce shall file its remand determination with the court within 60 days

(October 21, 2013).  The parties shall have 30 days thereafter (November 20, 2013) to file

objections and the Government will have 15 days thereafter (December 5, 2013) to file its

response.


                                                     /s/ Jane A. Restani
                                                  Jane A. Restani
                                                       Judge

Dated: August 21, 2013
       New York, New York